## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JEFFREY SCHWARTZ, individually and on behalf of all others similarly situated,<br><br>                                    Plaintiff,<br><br>     v.<br><br>ANTADI LLC,<br><br>                                    Defendant. | Civil Action No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Jeffrey Schwartz ("Plaintiff") brings this action on behalf of himself and all others similarly situated against Defendant Antadi LLC, d/b/a Aroeve ("Defendant" or "Aroeve"). Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to the allegations specifically pertaining to himself, which are based on his own personal knowledge.

### NATURE OF THE ACTION

1.      This is a civil class action lawsuit against Defendant Aroeve for false and misleading representations that it made and continues to make about its Aroeve Air Purifier models MK01, MK04, and MK06 (the "Air Purifiers" or the "Products") and associated replacement filters.[1]  Defendant markets and sells the Products in multiple distribution channels, including but not limited to Amazon.com and on its own website (www.aroeve.com).

2.      Defendant represented that the Products were equipped with High Efficiency Particulate Air (HEPA) filters and met HEPA 13 ("H13") filtration standards when, in fact, they

---

[1] The various models are all substantially similar in that they either use the same replacement filters or the same substandard filter materials as a basis for their common HEPA claims.

did not. Defendant additionally represented that it "test[s] products rigorously to present them in the best condition" and that its Products had "4+ Certificates."

3.     Independent testing by Plaintiff's counsel, and testing commissioned by Vesync Corporation (a competitor of Defendant) as part of a challenge brought through the National Advertising Division of the Better Business Bureau (NAD) in or about May 2024, has shown that the replacement filters and the filters inside the Products do not meet HEPA or H13 standards.[2]

4.     Reasonable consumers have had no opportunity to find this out for themselves because they cannot conduct HEPA testing to verify the H13 rating of the Products.

5.     Defendant knew this but continues to sell the Products and replacement filters. Indeed, one of Defendant's Products is among the best-selling home air purifiers on Amazon.

6.     In response to the NAD challenge brought by Vesync, Defendant agreed to remove its false and misleading HEPA and/or H13 representations about the Products' filters from the Product pages and packaging of its Products. However, this attempt at remediation is a day late and a dollar short. Defendant has profited greatly from the explosion in the air-purifier market brought about by the ongoing COVID-19 pandemic and yearly "once-in-a-lifetime" wildfires that have ravaged the United States. Consumers are rightfully concerned about maintaining indoor spaces that are free of harmful pathogens and contaminants. As a result, a large portion of Defendant's enormous profits are attributable to the HEPA filtration claims that it falsely made about its Products.

7.     Consumers are likely to trust Defendant's HEPA and/or H13 claims, as it does millions of dollars a month in sales on Amazon.com and because Defendant's MK01 Product is

---

[2] https://bbbprograms.org/media-center/dd/aroeve-hepa

featured as "Amazon's Choice in HEPA Filter Air Purifiers by AROEVE." On its Amazon page, Defendant represents that its Products are the "Choose [sic] of 3,800,000+ People & Families in the US" and that these Products "provide healthy living for over 1 million families."

8.     HEPA, or High Efficiency Particulate Air filters, are pleated mechanical air filters that work by drawing in and filtering out 99.97% of airborne particles at the most penetrating particle size, including viruses, bacteria, and other small particles.[3] A HEPA filter rated H13 can trap 99.95% of particles, and is considered medical grade.

9.     HEPA filters have been found to consistently reduce the number of airborne infectious particles, including those of coronavirus SARS-CoV-2.[4] For this reason, the U.S. Centers for Disease Control and Prevention has recommended the use of HEPA filters to reduce indoor transmission of coronavirus.[5]

10.     Indeed, customer reviews of Defendant's Products reveal consumers' reasonable reliance on Defendant's representations. One Amazon review explains "I am a teacher … My previous district provided air purifiers when COVID started, my new district did not. I had kids sneezing and coughing all the time. I bought this and turn it on daily …."[6] Another reviewer

---

[3] EPA. *What is a HEPA filter?* https://www.epa.gov/indoor-air-quality-iaq/what-hepa-filter (accessed 6/14/2024).

[4] Ueki H, Ujie M, Komori Y, Kato T, Imai M, Kawaoka Y. *Effectiveness of HEPA Filters at Removing Infectious SARS-CoV-2 from the Air*. mSphere 2022; 7:e00086–22. 10.1128/msphere.00086-22 (accessed 6/14/2024).

[5] Lindsley WG, Derk RC, Coyle JP, et al. *Efficacy of Portable Air Cleaners and Masking for Reducing Indoor Exposure to Simulated Exhaled SARS-CoV-2 Aerosols — United States, 2021*. MMWR Morb Mortal Wkly Rep 2021;70:972–976. DOI: http://dx.doi.org/10.15585/mmwr.mm7027e1 (accessed 6/14/2024).

[6] Amazon. "AROEVE Air Purifiers for Home, Air Purifier Air Cleaner for Smoke Pollen Dander Hair Smell Portable Air Purifier with Sleep Mode Speed Control for Bedroom Office Living Room, MK01- White." In Customer Reviews (Sept. 17, 2022). https://www.amazon.com/AROEVE-Purifiers-Portable-Purifier-Kitchen/dp/B09FJSJQ95?ref_=ast_sto_dp&th=1 (accessed 6/17/2024).

wrote, "Will be using this always as my wife is a nurse who gets in contact with sick patients a lot."[7]

11.    Even projecting from the minimum units within the range of Defendant's Amazon sales in the past month, Defendant has made an estimated 31.5 million dollars from its sales of these Products on Amazon in the past year alone.  These sales estimates do not include the Products sold directly through Defendant's website nor do they include the estimated sales of replacement filters.

**TABLE A**

| Product | Amazon sales in past month | Projected unit sales, past 12 months | Price | Total estimated annual sales |
|---|---|---|---|---|
| MK01 - White | 20K+ | 240,000 | $ 49.99 | $11,997,600.00 |
| MK01 - Black | 10K+ | 120,000 | $ 49.99 | $5,998,800.00 |
| MK04 - White | 5K+ | 60,000 | $ 119.99 | $7,199,400.00 |
| MK04 - Black | 2K+ | 24,000 | $ 119.99 | $2,879,760.00 |
| MK06 - White | 5K+ | 60,000 | $ 35.99 | $2,159,400.00 |
| MK06 - Black | 3K+ | 36,000 | $ 35.99 | $1,295,640.00 |
| | | | **Total** | **$31,530,600.00** |

12.    But for Defendant's false and misleading claims, the fair value of its Products would have been substantially lower, i.e., the market price would have been closer to non-HEPA filters, which sell at a discount relative to HEPA-rated purifiers.  This is particularly true for Defendant, which not only makes a "HEPA" claim but also an "H13" claim.  Defendant represented the Products' H13 filter status alongside logos for testing and certification entities SGS, California Air Resources Board, and Intertek.[8]

---

[7] *Id*. at Customer Reviews (Dec. 10, 2021).

[8] Archived page from Defendant's website.

13.     Put differently, Defendant's HEPA misrepresentations allowed it to overcharge the class in the amount of the HEPA and HEPA 13-related price premium—even assuming there would be a market for Defendant's non-HEPA filters at all.

14.     Defendant's false and misleading representations induced reasonable consumers like Plaintiff into purchasing the Products.  Had Plaintiff and all other similarly situated consumers known that, contrary to Defendant's representations, the Products did not have HEPA-grade filters, they would have paid less for the Products and replacement filters or not purchased them at all.

15.     Plaintiff now seeks a return of the premium that Defendant charged for its Products on behalf of himself and other similarly situated purchasers.  Plaintiff asserts claims on behalf of himself and all other similarly situated purchasers of Defendant's Products for: (i) violation of New York's General Business Law ("GBL") § 349; (ii) violation of New York's GBL § 350; (iii) breach of express warranty; (iv) fraud; and (v) unjust enrichment.

## PARTIES

16.     Plaintiff Jeffrey Schwartz is a citizen of New York, resides in New York, New York, and intends to stay there.  While in New York, Plaintiff Schwartz purchased an Aroeve MK06 Air Purifier from Defendant's Amazon store webpage on October 11, 2023 for $37.99.  Plaintiff Schwartz became interested in purchasing an air purifier when smoke from Canadian wildfires consumed New York in June of 2023.  Plaintiff Schwartz suffers from asthma and allergies and knew to look for the HEPA label while purchasing the air filter.  Plaintiff Schwartz associated the HEPA label with high-quality filtration and paid a price premium for the Product for this reason.  Plaintiff Schwartz reviewed and reasonably relied on Defendant's warranties and representations about the Product's HEPA-grade prior to purchasing the Product.  Had

Defendant not warranted and represented that its Products were HEPA grade, Plaintiff Schwartz would not have purchased the Product or would have paid substantially less for them.

17.     Defendant Antadi LLC is a Delaware company with a registered address at 615 West Mt. Pleasant Ave, Suite 2, Livingston, NJ 07039.

18.     Plaintiff reserves the right to amend this Complaint to add different or additional defendants, including without limitation any officer, director, employee, supplier, or distributor of Defendant who has knowingly and willfully aided, abetted, and/or conspired in the false and deceptive conduct alleged herein.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendant.

20.     This Court has personal jurisdiction over the parties because Plaintiff resides in New York, is a citizen of New York, and submits to the jurisdiction of the Court, and because Defendant has, at all times relevant hereto, systematically and continually conducted, and continues to conduct, business in this State.  Defendant therefore has sufficient minimum contacts with this state, including within this District, and/or intentionally availed itself of the benefits and privileges of the New York consumer market through the promotion, marketing, and sale of its Products to residents within this District and throughout this State.

21.     Venue is proper in this Court under 28 U.S.C. § 1391 because Defendant transacts significant business within this District, Plaintiff reside within this District, and a substantial part of the events giving rise to Plaintiff's claims took place within this District.

## FACTUAL ALLEGATIONS

**AIR PURIFIERS AND THE AIR-PURIFIER MARKET**

22.    The Environmental Protection Agency estimates that "about 67 million tons of pollution were emitted into the atmosphere in the United States" in 2021 alone.  This pollution comes at great cost to human health: "[p]oor air quality is responsible for an estimated 100,000 premature deaths in the United States each year."  Exposure to air particulates has also been linked to symptoms of depression, cognitive decline, and increased feelings of anxiety.

23.    Air pollution can also be a visceral reminder of human-driven climate change: the smoke from wildfires that have raged across both coasts of the United States since 2020 has quite literally blocked out the sun and forced millions of people indoors.  For many, the smoke has exacerbated health conditions such as asthma or emphysema.

24.    As a result, public concern about air pollution is high.  In fact, one 2019 survey found that, of about 1000 responses, 43% of respondents indicated that they had a "great deal" of concern about air pollution in the United States and 31% indicated that they had a "fair amount" of concern about air pollution.  Taken together, 74% of respondents expressed concern about air pollution.  This is in line with the EPA's concerns – the agency places indoor air pollution among the top five environmental health risks.

25.    Concern about air quality skyrocketed in 2020, however, as wildfires intensified and the airborne COVID-19 virus shut down the globe.

26.    As expected, consumer concern over airborne contaminants has helped the air-purifiers market explode, from $8.05 billion in 2019 to $13.97 billion in 2022: "the COVID-19 pandemic has increased the demand for air purifiers, with the growing awareness of COVID-19 associated respiratory ailments and the rising need to curb cross-contamination.  Factors such as

increasing airborne diseases and growing health consciousness among consumers are driving the market."[9]

27.    Air purifiers come in various forms.  Among the most effective purifiers are those with HEPA filters.  HEPA is an acronym for "High Efficiency Particulate Air."  HEPA filters are strictly designed and must adhere to certain specifications to be called a HEPA filter.

28.    Specifically, a HEPA filter is a type of pleated mechanical filter that typically consists of sheets of randomly arranged fiberglass or plastic fibers held in an accordion shape by aluminum separators.  The EPA states that a HEPA filter can "remove at least 99.97% of dust, pollen, mold, bacteria, and any airborne particles with a size of 0.3 microns (μm)."[10]  However, the EPA clarifies that "the diameter specification of 0.3 microns corresponds to the worst case; the most penetrating particle size (MPPS)," and that "[p]articles that are larger or smaller are trapped with even higher efficiency."[11]  Accordingly, the EPA states that "[u]sing the worst case particle size results in the worst case efficiency rating (i.e. 99.97% or better for all particle sizes)."[12]  Manufacturers often define HEPA as "99.97% at 0.3 microns" in their advertising, but this is merely a shorthand for the true HEPA definition: "99.97% or better for all particle sizes." For example, in the event a filter captures 99.97% of particles 0.3 microns, but *does not* reach 99.97% at 0.2 microns, the filter would not qualify as HEPA.

---

[9] Research and Markets, *Air Purifier Market – Growth, Trends, COVID-19 Impact, and Forecasts (2022 – 2027)*, WWW.RESEARCHANDMARKETS.COM, https://www.researchandmarkets.com/reports/4987153/air-purifier-market-growth-trends-covid-19 (last visited Nov. 9, 2023).

[10] https://www.epa.gov/indoor-air-quality-iaq/what-hepa-filter

[11] *Id.*

[12] *Id.*



29.    According to the Centers for Disease Control and Prevention, HEPA filters "are the most efficient filters on the market for trapping particles that people exhale when breathing, talking, singing, coughing, and sneezing."[13]

30.    Thus, for example, even though the SARS-CoV-2 virus is about 0.125 microns in diameter, the CDC has stated that "air purifiers can help reduce airborne contaminants, including viruses, in a home or confined space."[14]

31.    The reason why consumers care that the air purifier they purchase meets the HEPA standard is self-evident.  It offers near certain protection against the transmission of

---

[13] Centers for Disease Control and Prevention. *Improving Ventilation in Your Home*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/improving-ventilationhome (last accessed April 3, 2024).

[14] *Id.*

airborne pathogens in the home (if the purifier is given enough time to circulate the air), and it can also filter out pollution caused from events like wildfires, which are growing ever more frequent.

32.    Consumers want the assurance that the HEPA standard provides, and they are willing to pay more for HEPA filters, *i.e.*, consumers are willing to pay a premium for filters that meet the HEPA standard.  A review of current sales prices, across brands that sell both HEPA and non-HEPA filters (what marketers sometimes call "HEPA-type" purifiers), indicates that HEPA purifiers sell—on average—at a 41% premium to non-HEPA filters within the same brand:

**TABLE B**

| Model | HEPA | | | Non-HEPA | | | HEPA premium |
|---|---|---|---|---|---|---|---|
| | Price | Coverage | Price/sf | Price | Coverage | Price/sf | |
| Molekule[15,] | $1,015 | 1,000 sf | $1.02 | $600 | 1,000 sq/ft | $0.60 | 41% |
| Holmes[16, 17] | $40 | 80 sf | $0.50 | $35 | 109 sq/ft | $0.32 | 36% |
| Crane[18, 19] | $90 | 250 sf | $0.36 | $61 | 300 sq/ft | $0.20 | 44% |
| Therapure[20, 21] | $180 | 200 sf | $0.90 | $180 | 343 sq/ft | $0.52 | 42% |
| | | | | | | **Average premium** | **41%** |

---

[15] Molekule, *Air Purifiers*, WWW.MOLEKULE.COM, https://molekule.com/collections/purifiers (last visited Nov. 9, 2023).

[16] Amazon, *Holmes True HEPA Allergen Remover Mini Tower Air Purifier with Optional Ionizer | Small Space Air Purifier, White (HAP706-NU-1)*, (URL Omitted for Space) (last visited Nov. 9, 2023).

[17] Amazon, *Holmes Desktop HEPA-Type, 3 Speeds plus Optional Ionizer small Air Purifier, HAP242B-U,* (URL Omitted for Space) (last visited Nov. 9, 2023).

[18] Amazon, *Crane Air Purifier with True HEPA Filter, Germicidal UV Light, 250 Sq Feet Coverage, Timer Function, Sleep Mode, Washable Particle Filter, EE-5067*, (URL Omitted for Space) (last visited Nov. 9, 2023).

[19] WWW.AMAZON.COM, https://www.amazon.com/Purifier-Protection-EE-7002AIR-Functions-Replaceable/dp/B085J1R4M1 (last visited Nov. 9, 2023).

[20] Amazon, *ENVION Therapure TPP540 Medium to Large Room Filter HEPA Air Purifier with 3 Fan Speeds, LED Display, and 24 Hour Timer, Black*, (URL Omitted for Space)  (last visited Nov. 9, 2023).

[21] Amazon, *Boneco Envion Therapure Triple Action Purification Air Purifier Tower with HEPA-Type Filter, 343 Sq. Ft. Capacity*, WWW.AMAZON.COM, https://www.amazon.com/Envion-Boneco-Germicidal-Hemispheric-Purification/dp/B005BTVL76?ref_=ast_sto_dp&th=1 (last visited Nov. 9, 2023).

33.     Being able to make a "HEPA-filtration" claim is thus a huge boon for manufacturers, and they know it.  The HEPA standard claim is a signal to consumers that the product they are purchasing has been constructed to exacting standards and is able to provide superlative levels of filtration.

34.     Accordingly, the term "HEPA" is now ubiquitous in air purifier marketing, including Defendant's.  The reason for this is that the phrase carries weight.  It is a signal of quality to consumers—that the air purifier they are buying is of a high grade and worth more than purifiers that do not have a HEPA filter.  Though consumers, including Plaintiff, may not know the filtration efficiency requirements of the HEPA standard, or the technicalities of the various HEPA-standard testing protocols, they recognize the HEPA acronym and are willing to pay more for air purifiers that have it in their marketing and labeling.  If having a HEPA filter was not material to consumers, then manufacturers like Defendant would not advertise the feature so heavily, nor would Defendant bring HEPA false advertising disputes through NAD. In fact, given consumer preference for HEPA filters, there are few, if any, non-HEPA filters left on the market, i.e., there is little to no demand for filters that do not bear the HEPA designation.

35.     The materiality to consumers of HEPA representations is further confirmed by enforcement actions taken by regulators including the Federal Trade Commission, which has, among other things, entered into Consent Decrees with manufacturers of air purifiers for claims made about the efficacy of their HEPA purifiers and filters.  *See, e.g., In the Matter of Honeywell,* FTC File No. 962-3154.[22]

---

[22] *Available at https://www.ftc.gov/legal-library/browse/cases-proceedings/962-3154-honeywell-inc-matter.*

36.     While Defendant makes a number of representations about the capabilities of its Products, "HEPA" is front and center.  Ultimately, Defendant knows that consumers are primarily driven to make their purchase based on the presence of "HEPA" in the Product's name or on the Product' s packaging.  Consumers would not have purchased or would have paid significantly less for Defendant's Products if the word HEPA was not present – even if all of the other marketing representations remained such as filtration efficiency figures.  Consumers value HEPA far more than any of the other marketing terms and technical information that Defendant provides.

**DEFENDANT'S PRODUCT AND ADVERTISING**

37.     At issue in this action are Defendant's Air Purifiers with model numbers MK01, MK04, and MK06.

38.     The Products are cylindrical and cube-shaped devices that accept a filter.  The MK01 retails for $44.99 on the Aroeve website or $49.99 on Amazon.  The MK04 retails for $94.99 on the Aroeve website or $119.99 on Amazon.  The MK06 retails for $42.99 on the Aroeve website or $35.99 on Amazon.

39.     Replacement filters for the Products are cylindrical wheels or rectangular inserts, depending on the associated Product.  Individual replacement filters for the MK01 and MK06 are interchangeable and retail for $9.90 or $15.99 on the Aroeve website, depending on discount, or for $11.00 on Amazon.  Individual replacement filters for the MK04 retail for between $19.90 and $29.99 on the Aroeve website and for $15.00 on Amazon.

40.     Defendant crafted multiple unique false and misleading representations about the Products and replacement filters, including those set forth below in Paragraph 41(a), (b), (c), (d); Paragraph 42(a) and (b); and Paragraph 43 (the "HEPA Claims").

41.     For instance, Defendant made the following express representations in the

advertising for the Products.  All of these representations were found on Defendant's Amazon page for the MK01 Product (April 4, 2023):

      a)   "H13 HEPA Air Purifiers";

      b)   "AROEVE air purifier uses H13 HEPA filter, which can effectively filter any particles larger than 0.3 microns";

      c)   "No corner is left untouched, we will guard your health";

      d)   "[R]efreshes the air 5x per hour in rooms as large as 215 ft$^2$";

42.    Below is a screenshot for Defendant's MK01 from its Amazon page:



43.    Similar claims appeared on Defendant's Website for its MK04 Product (Dec. 1, 2023):

      a)   MK-04 is equipped with an H13 True HEPA Filter and a high-efficiency filtration system, which can effectively filter particles as small as 0.3 microns in the air, and refresh the air in a room up to 1095 sq ft / 100 m² every hour."

44.    Similar claims appeared on Defendant's Website for its MK06 Product (Dec. 1, 2023):

    a)    "The air purifier is equipped with HEPA filters that meet high-efficiency particular air (HEPA) standards";

    b)    "The air that the family breathes is not only healthy and comfortable, but fragrant …."

45.    Defendant's website still contains remnants of the HEPA claims.  Under its "FAQ" for the MK06, Defendant responds to "Do I have to change the heap [sic] filter?" (June 17, 2024).

46.    Defendant touts the Product's "HEPA 13 Filtration" status because it allows it to claim that the Products provide *better* filtration than a non-HEPA filter.  It is for this reason that Defendant is able to charge a premium for its Products.

47.    In essence, Defendant claims the Products provide better filtration than other competing non-HEPA products, and charges accordingly.  Defendant's marketing campaign has worked.  It has allowed Defendant's Products to surge to rise on Amazon's sales charts for HEPA air purifiers, with its MK04 ranked 15th and Sponsored placements for the MK04 and the MK01 also appearing on the first page of results despite these Products not meeting HEPA standards.

48.    Hundreds of thousands of consumers, including Plaintiff, have purchased the Products based on the HEPA Claims.  They were convinced that they were purchasing a high-quality, high-performance, premium product.  Unfortunately, they were duped.  Defendant's HEPA Claims are entirely fabricated.

**DEFENDANT'S PRODUCTS WERE TESTED AND FAILED TO MEET THE ADVERTISED HEPA CLAIMS**

49.    Around the beginning of 2024, Plaintiff's counsel commissioned a nationally recognized lab to test the MK01, MK04 and MK06 Products.

50.     The testing was conducted in accordance with the American protocol used to establish HEPA-grade, IEST-RP-CC001.7 ("IEST").

51.     Per the IEST protocol, and in accordance with the EPA definition of a HEPA filter, the filter must have a filtration efficiency of at least 99.97% at the most penetrating particle size (i.e., at least 99.97% for all particles).

52.     Defendant claims its Products are H13, which means the Products need to filter out <u>at least</u> 99.95% of particles at the most penetrating particle size.  The results of the test are shown in the below charts. To meet the HEPA standard the Products needed to filter out <u>at least</u> 99.97% of particles.  All results that fell below the HEPA standard are labeled in red.

**IEST-RP-CC-001.7 Results – MK01**

| Particle Size Range (µm) | Filtration Efficiency (%) |
| --- | --- |
| 0.1 - 0.2 | 87.6 |
| 0.2 - 0.3 | 92.4 |
| 0.3 | 93.4 |

**IEST-RP-CC-001.7 Results – MK04**

| Particle Size Range (µm) | Filtration Efficiency (%) |
| --- | --- |
| 0.1 - 0.2 | 98.2 |
| 0.2 - 0.3 | 98.9 |
| 0.3 | 99.2 |

**IEST-RP-CC-001.7 Results – MK06**

| Particle Size Range (µm) | Filtration Efficiency (%) |
| --- | --- |
| 0.1 - 0.2 | 85.7 |
| 0.2 - 0.3 | 88.2 |
| 0.3 | 89.1 |

53.     As can be seen, not only do the Products not meet HEPA standards of 99.97% filtration efficiency, they also do not meet the H13 standard of 99.95% filtration.

54.     Indeed, the Products failed the IEST HEPA test at <u>every single point of measurement.</u>  In fact, the Products were not even remotely close to meeting the European H13 or American HEPA standards.

55.     Under the IEST-RP-CC001.7 standard, the MK01's filtration efficiency at 0.3 microns was 93.4%, far below the 99.95% threshold for the HEPA 13 standard.  The MK04 filtered only 99.2% of particles sized 0.3 microns.  The MK06 filtered only 89.1% of particles at 0.3 microns, even further below the 99.95% HEPA 13 standard.

56.     Defendant knew or should have known that its HEPA Claims were false because it expressly claimed that its Air Purifiers were equipped with HEPA filters.  Plaintiff's testing proves the filters are not HEPA grade.  So, either Defendant had testing showing its Products did not actually have HEPA filters, or it did not possess any testing and it lied about its Products.

57.     Throughout the class period, Defendant made repeated express representations on the Products' packaging and in its marketing that the Products included a HEPA-grade filter of H13 status.  Plaintiff's counsels' testing proves otherwise.  The filter in Defendant's Products performs nowhere near the HEPA standard.  Defendant's advertising is thus false and highly misleading to consumers like Plaintiff and the members of the classes they seek to represent.

58.     By making the HEPA Claims about its Products, Defendant was able to overcharge the class in the amount of the premium associated with those claims.

59.     Defendant's HEPA Claims appeared on the Air Purifiers' packaging; appeared on the webpages where its Products were sold; were baked into the name of the Products on their listings; and Defendant allowed the Products to be placed in the HEPA Product category on online retailers.  Accordingly, those specific claims were seen by most, if not all, purchasers of the Products and replacement filters.

60.     Defendant's HEPA Claims misled reasonable consumers. Defendant is a leading

manufacturer of air purifiers, so consumers would reasonably believe Defendant's HEPA

Claims; consumers do not and cannot typically test the accuracy of a HEPA Claim before

purchasing an air purifier; and Defendant's HEPA Claims were expressly false, not impliedly

false (Defendant explicitly claimed that Defendant's air purifiers and filters meet the HEPA and

H13 standards and represented its purification efficiency). A reasonable consumer would

interpret Defendant's HEPA Claims as express and true statements.

61.     If Defendant had not made the HEPA Claims, then the market price of the

Products and their filters would have been lower, *i.e.*, those market prices would have been less

than they were in the actual world, and closer to the price of "regular" non-HEPA air purifiers.

62.     Accordingly, Plaintiff and the proposed Classes paid for Defendant's Products at

artificially inflated prices. In other words, Defendant's HEPA Claims allowed it to overcharge

Plaintiff and the Classes, who were damaged in the amount of that overcharge.

## CLASS ALLEGATIONS

63.     ***Class Definition.*** Plaintiff brings this action as a class action pursuant to Federal

Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), on behalf of himself and all other

similarly situated consumers, and seek to represent a class (the "Class") defined as:

> All persons in the United States who purchased an Aroeve
> MK01, MK04, and MK06 air purifier or replacement filter
> during the applicable statutory period.

64.     Plaintiff Schwartz also seeks to represent a New York subclass (the "New York

Subclass") defined as follows:

> All New York residents who purchased an Aroeve MK01,
> MK04, and MK06 air purifier or replacement filter during
> the applicable statutory period.

65.     The Class and New York Subclass are collectively referred to as the "Classes."

66.     Specifically excluded from the Classes are Defendant and any entities in which Defendant has a controlling interest, Defendant's agents and employees, the judge to whom this action is assigned, members of the judge's staff, and the judge's immediate family.

67.     Plaintiff reserves the right to amend the definition of the Class if discovery or further investigation reveals that the Class should be expanded or otherwise modified.

68.     ***Numerosity.***  Members of the Class are so numerous that their individual joinder herein is impracticable.  On information and belief, the Class comprises at least thousands of consumers throughout New York.  The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery.  Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant.

69.     ***Commonality and Predominance.***  Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. These common legal and factual questions include, but are not limited to:

a)  Whether the Products are in fact HEPA or H13-grade;

b)  Whether Defendant's HEPA Claims included false and/or misleading statements and/or omissions;

c)  Whether Defendant knowingly made false HEPA Claims about the Products;

d)  Whether Defendant's HEPA Claims were material;

e)  Whether an objectively reasonable consumer would have been misled by Defendant's HEPA Claims; and

f)  Whether Defendant's HEPA Claims allowed it to charge more for the Products than it otherwise could have.

70.     ***Typicality.***  Plaintiff's claims are typical of the claims of the proposed Classes they seek to represent because Plaintiff, like all members of the Classes, was induced by Defendant's false and misleading HEPA Claims to purchase Defendant's Products, and

subsequently did purchase one of Defendant's Products during the relevant periods without

knowing that the HEPA Claims were false and misleading.  Plaintiff, like all members of the

Classes, have been damaged by Defendant's misconduct in the very same way as the members of

the Classes.  Further, the factual bases of Defendant's misconduct are common to all members of

the Classes and represent a common thread of misconduct resulting in injury to all members of

the Classes.

71.     *Adequacy*.  Plaintiff is an adequate representatives of the Classes he seeks to

represent because his interests do not conflict with the interests of the members of the Classes.

Plaintiff has retained competent counsel that are experienced in prosecuting class action and

intends to prosecute this action vigorously.  The interests of the members of the Classes will be

fairly and adequately protected by Plaintiff and his counsel.

72.     *Superiority*.  A class action is superior to other available means for the fair and

efficient adjudication of the claims of the members of the Classes.  Each individual member of

the Classes may lack the resources to undergo the burden and expense of individual prosecution

of the complex and extensive litigation necessary to establish Defendant's liability.  Individual

litigation increases the delay and expense to all parties and multiplies the burden on the judicial

system presented by the complex legal and factual issues of this case.  Individual litigation also

represents a potential for inconsistent or contradictory judgments.  By contrast, the class-action

device presents far fewer management difficulties and provides the benefits of single

adjudication, economy of scale, and comprehensive supervision by a single court on the issue of

Defendant's liability.  Class treatment of the liability issues will ensure that all claims and

claimants are before this Court for consistent adjudication of the liability issues.

## COUNT I
### Violation of New York Business Law § 349 ("GBL")
### On Behalf of Plaintiff and New York Subclass Members

73.     Plaintiff re-alleges and incorporates by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

74.     Plaintiff brings this claim individually and on behalf of the members of the proposed New York Subclass against Defendant.

75.     This claim is brought pursuant to the laws of the State of New York.

76.     New York General Business Law Section 349 ("GBL § 349") declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state."

77.     Defendant committed deceptive acts and practices by employing false, misleading, and deceptive representations about its Products.

78.     Information as to the capacity, efficacy, and certifications of these Products was in Defendant's exclusive control.  Plaintiff could not possibly have known that the Products at issue were not being sold as advertised, as such information was not available to the public.

79.     Defendant's deceptive acts and practices were directed at consumers.

80.     Defendant's deceptive acts and practices are misleading in a material way because they violate consumers' reasonable expectations.  Defendant knew consumers would purchase its Products and/or pay more for them under the false – but reasonable – belief that these Products met HEPA and H13 filtration standards.

81.     Defendant knows that advertising about its Products is material to consumers.  If such information were not material, Defendant would not have marketed its Products as having an "H13 True HEPA filter."  As a result of its deceptive acts and practices, Defendant sold at least tens of thousands of Products to unsuspecting consumers across New York.

82.    If Defendant had advertised its Products truthfully and in a non-misleading fashion, Plaintiff and other New York Subclass Members would not have purchased them or would not have paid as much as they did for them.

83.    As a direct and proximate result of Defendant's false, misleading, and deceptive representations, Plaintiff and other members of the New York Subclass were injured in that they would not have purchased the Products, or would have paid substantially less for them, but for Defendant's misrepresentations about the quality of its Products.

84.    On behalf of himself and Members of the New York Subclass, Plaintiff seeks to recover his actual damages or fifty (50) dollars per violation, whichever is greater, three times actual damages, and reasonable attorneys' fees.

**COUNT II**
**Violation of New York GBL § 350**
**(On Behalf of Plaintiff and the New York Subclass Members)**

85.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

86.    Plaintiff brings this claim individually and on behalf of the New York Subclass against Defendant.

87.    This claim is brought pursuant to the laws of the State of New York.

88.    New York General Business Law Section 350 declares unlawful "[f]alse advertising in the conduct of any business, trade, or commerce or in the furnishing of any service in this state."

89.    New York General Business Law Section 350-a(1) defines false advertising as "advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect.  In determining whether any advertising is misleading, there shall be taken into account (among other things) not only representation made by statement, word, design, device, sound or any

combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity or employment to which the advertising relates under the conditions proscribed in said advertisement, or under such conditions as are customary or usual."

90.     Defendant's labeling and advertisements contain untrue and materially misleading statements concerning Defendant's Products because they misrepresent the HEPA status of its Products.  By misrepresenting the true capacity of the Products, Defendant's marketing and labeling misleads a reasonable consumer.

91.     Defendant had exclusive knowledge of the capacity of its Products.

92.     Defendant's misrepresentations and omissions were material because consumers are concerned with efficacy of the air purifiers they purchase.

93.     As a result of Defendant's misrepresentations and omissions, Plaintiff and members of the Class and Subclass have suffered economic injury because they would not have purchased the Products, or would have paid substantially less for them, if they had known that the Products posed a serious risk for addiction.

94.     Defendant's material misrepresentations were substantially uniform in content, presentation, and impact upon consumers at large.  Moreover, consumers continue to be exposed to Defendant's material misrepresentations.

95.     As a result of Defendant's recurring, unlawful deceptive acts and practices, Plaintiff and members of the New York Subclass are entitled to monetary, statutory damages of $500 per violation, compensatory, treble and punitive damages, restitution, and disgorgement of all moneys obtained by means of Defendant's unlawful conduct, interest, and attorneys' fees and costs.

**COUNT III**
**Breach of Express Warranty, U.C.C. § 2-313**

96.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

97.     Plaintiff brings this claim individually and on behalf of members of the Class against Defendant.

98.     In connection with the sale of the Products, Defendant, as the producer, marketer, distributor, and/or seller issued written warranties by representing the following about the Products and replacement filters:

   a)  "[E]quipped with an H13 True HEPA Filter";

   b)  "H13 HEPA Air Purifiers";

   c)  "AROEVE air purifier uses H13 HEPA filter, which can effectively filter any particles larger than 0.3 microns";

   d)  "No corner is left untouched, we will guard your health";

   e)  The MK01 "refreshes the air 5x per hour in rooms as large as 215 $ft^2$";

   f)  The MK04 "can refresh the air in a room as large as 1095 $ft^2$ / 100 m² every hour";

   g)  The MK06 "refreshes the air per hour in spaces up to 215 $ft^2$/20 m²"; and

99.     Plaintiff and the Class members relied on these statements in making their purchasing decisions.

100.    In fact, the Products do not conform to these representations because none of these claims are true.  As described more fully above, the Products were tested and shown to perform well below the HEPA or H13 level, and do not have a HEPA filter.

101.    Plaintiff and Class members were injured as a direct and proximate result of Defendant's breach because (a) they would not have purchased the Products if they had known that Defendant's representations about the Products were false, and (b) they overpaid for the Products on account of the misrepresentation.

102.    On June 25, 2024 Plaintiff's counsel notified Defendant of his claims in a demand letter shortly after learning about its breach of warranty, sent via certified mail, with return receipt requested.

103.    The demand letter was sent within a reasonable time after Plaintiff discovered Defendant's breach and learned of the nature of Defendant's practices.  The letter therefore complied with all respects of U.C.C. § 2-607.

## COUNT IV
### Fraud

104.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as if fully stated herein.

105.    Plaintiff brings this claim individually and on behalf of the members of the Class.

106.    As alleged in detail above, Defendant knew that the HEPA Claims were material to consumers.  Defendant also knew the HEPA Claims were false and misleading, yet continued to make the HEPA Claims.

107.    Defendant was in a position to know (and did know) the HEPA Claims misrepresented the true quality of its Products yet continued to make the HEPA Claims despite this.

108.    Defendant's false and misleading HEPA Claims, upon which Plaintiff and the members of the Classes relied, were intended to induce and actually did induce Plaintiff and the members of the Classes to purchase the Products and replacement filters.  Had Plaintiff and the Class members known the truth about the Products and replacement filter, they would not have purchased the Products and replacement filters or would have paid substantially less for them.

109.    Defendant's fraudulent actions caused damages to Plaintiff, the Class, and Subclass members, who are entitled to damages and other legal and equitable relief as a result.

## <u>COUNT V</u>
**Unjust Enrichment**

110.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

111.    Plaintiff brings this claim individually and on behalf of the Classes against Defendant.

112.    Plaintiff and the members of the Classes conferred a benefit on Defendant in the form of the gross revenues Defendant derived from the money they paid to Defendant.

113.    Defendant had an appreciation or knowledge of the benefit conferred on it by Plaintiff and the members of the Classes.

114.    Defendant has been unjustly enriched in retaining the revenues derived from Plaintiff and the Class members' purchases of the Products, which retention of such revenues under these circumstances is unjust and inequitable because Defendant misrepresented  that the Products had a HEPA filter.  This caused injuries to the Plaintiff and members of the Classes because they would not have purchased the Products or would have paid less for them if the true facts concerning the Products had been known.

115.    Defendant accepted and retained the benefit in the amount of the gross revenues derived from sales of the Products to Plaintiff and the members of the Classes.

116.    Defendant has thereby profited by retaining the benefit under circumstances which would make it unjust for Defendant to retain the benefit.

117.    Plaintiff and the members of the Classes are, therefore, entitled to restitution in the form of the revenues derived from Defendant's sale of the Products.

118.    As a direct and proximate result of Defendant's actions, Plaintiff and the members of the Classes have suffered in an amount to be proven at trial.

119.    Here, equitable relief is appropriate because Plaintiff may lack an adequate remedy at law if, for instance, damages resulting from his purchase of the Product is determined

to be an amount less than the premium price of the Product. Without compensation for the full premium price of the Product, Plaintiff would be left without the parity in purchasing power to which he is entitled.

120.    Restitution may also be more certain, prompt, and efficient than other legal remedies requested herein. The return of the full premium price will ensure that Plaintiff and members of the Class are in the same place they would have been in had Defendant's wrongful conduct not occurred, i.e., in the position to make an informed decision about the purchase of the Products absent omissions with the full purchase price at their disposal.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court grant Plaintiff and all members of the proposed classes the following relief against Defendant:

(a)    For an order certifying the Nationwide Class, and New York Subclass and naming Plaintiff's attorneys as Class Counsel to represent the members of the Classes;

(b)    For an order declaring that Defendant's conduct violates the statutes reference herein;

(c)    For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

(d)    For prejudgment interest on all amounts awarded;

(e)    For an order of restitution and all other forms of equitable monetary relief;

(f)    For an order requiring Defendant to undertake a corrective advertising campaign;

(g)    For an order awarding Plaintiff and the Classes their reasonable attorneys' fees and expenses and costs of suit; and

(h)    Granting such other and further relief as many be just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury on all claims so triable.

Dated: December 23, 2024          Respectfully submitted,

**BURSOR & FISHER, P.A.**

By:   */s/ Alec M. Leslie*
        Alec M. Leslie

Alec M. Leslie
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646)-837-7150
Facsimile: (212) 989-9163
Email: aleslie@bursor.com


**BURSOR & FISHER, P.A.**
L. Timothy Fisher (*pro hac vice* forthcoming)
Luke Sironski-White (*pro hac vice* forthcoming)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com
       lsironski@bursor.com

**SINDERBRAND LAW GROUP, P.C**.
Greg Sinderbrand (*pro hac vice* forthcoming)
2829 Townsgate Road, Suite 100
Westlake Village, CA 91361
Telephone: (818) 370-3912
E-mail: greg@sinderbrandlaw.com

*Attorneys for Plaintiff*